# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

---

GLOBAL FREIGHT SYSTEMS  )
CO. W.L.L. GAMA         )
CENTER; and GENOA       )
PLASTIC INDUSTRIES,     )  Deposition of:
                        )
    Plaintiffs,         )  Paul Morrell
                        )
vs.                     )
                        )  Case No. 1:14-CV-00133-TC
AL-MORRELL DEVELOPMENT, )
LLC and PAUL A. MORRELL,)  Hon. Tena Campbell
                        )
    Defendants.         )

---

August 11, 2015 * 9:00 a.m.


Location:  Jones Waldo Holbrook & McDonough
   3325 North University Avenue, Suite 200
           Provo, Utah 84604


Reporter:  Diana Kent, RPR, CRR
Notary Public in and for the State of Utah



236 SOUTH 300 EAST
SALT LAKE CITY, UT 84111

**CitiCourt**
THE REPORTING GROUP

801-532-3441
FAX: 801-532-3414

WWW.CITICOURT.COM

INFO@CITICOURT.COM

```
 1                  A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3           James S. Lowrie
             Jessica P. Wilde
 4           JONES, WALDO, HOLBROOK &
             MCDONOUGH
 5           Attorney at Law
             170 South Main, Suite 1500
 6           Salt Lake City, Utah 84101
             Tel: (801) 521-3200
 7           Fax: (801) 328-0537
             jlowrie@joneswaldo.com
 8           jwilde@joneswaldo.com

 9   FOR THE DEFENDANT:

10           Christian Hansen
             HILLYARD ANDERSON & OLSEN
11           Attorney at Law
             595 South Riverwoods Parkway
12           Suite 100
             Logan, Utah  84321
13           Tel: (435) 752-2610
             Fax: (435) 753-8895
14           christian@hao-law.com

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   doing -- we were rebuilding bombed-out buildings that
 2   the U.S. military needed to use.  And we built PXs in
 3   Baghdad.  Anyway, it was a construction company
 4   initially, providing services for the military in Iraq.
 5         Q.    And I forgot to ask you where you live.
 6         A.    I live in Cache County.
 7         Q.    What's your address?
 8         A.    I should know the answer to this question.
 9   3497 South 5700 West, Wellsville, 84339.
10         Q.    And what's your business address?
11         A.    I don't really have an office anymore, so
12   let's use the same address.
13         Q.    Okay.  And you mentioned Paul Morrell,
14   Incorporated.  Who owns that?
15         A.    I do.
16         Q.    Anyone else?
17         A.    No.
18         Q.    And what does it own, in general terms?
19         A.    Paul Morrell, Incorporated has really been
20   defunct since we finished the dining business.  Paul
21   Morrell, Incorporated was initially used as my entity
22   for the consulting business.  And then we used it as
23   the entity for this business with the U.S. military and
24   the Olympics.  We used it for this business with the
25   dining facilities in Iraq.  But as AMD came online,
```

```
 1    which was a partnership between me and a brother at the
 2    time, Paul Morrell, Incorporated went offline,
 3    essentially.
 4         Q.    And what's the status of Al-Morrell
 5    Development today?
 6         A.    I own it in its entirety.  It hasn't had
 7    any activity other than cleaning up since 2011.  But
 8    I'm the sole owner.
 9         Q.    You said it started as a partnership
10    between you and your brother?
11         A.    That's correct.
12         Q.    And that's Phillip?
13         A.    Phillip Morrell, that's correct.
14         Q.    And what has been the cleaning up activity
15    since 2011?
16         A.    Well, much of it revolves around this case
17    we are going to talk about today.  So AMD - and I'm
18    using AMD as a reference to Al-Morrell Development -
19    owned all of our assets in Iraq.  And as the military
20    exited in 2011, AMD sold her assets to a local entity
21    we created called Bright Pearl.  And Bright Pearl was
22    then sold to an Iraqi organization.  And AMD had to go
23    through a transition during 2011 to transition
24    employees and assets, primarily, to this new entity.
25    And that's the cleanup I'm referring to.
```

1    Q.    Okay.  When did you start in Iraq with
2    this?
3    A.    Let me get my year right.  As I recall,
4    the U.S. government went into Iraq in the spring of
5    2003.
6    Q.    Okay.
7    A.    As they were preparing to go into Iraq,
8    the soldiers that we had worked for in Salt Lake called
9    us, me and my brother, and asked us to go to Turkey to
10   prepare basically a carpet between Iskenderun and the
11   Iraqi border for them to come in.  Dining facilities,
12   laundry facilities, all of the things they'd need for
13   their life sustainment.
14          So we went to Turkey in the spring of
15   2003, "we" being my brother and I, and we began
16   preparing those services.  We built a lot of
17   relationships between Turkish businesses in order to
18   provide those services.  And then eventually the
19   Turkish government voted against allowing the military
20   to use Turkey as their path to Iraq.  So the military
21   loaded all their vehicles back on ships and went down
22   to Kuwait.
23          But because we had built a structure, a
24   business structure in Turkey during that springtime,
25   KBR, who was operating out of Kuwait, hired us to build

1   six dining facilities in northern Iraq so that we could
2   bring all of the resources through Turkey.
3       Q.   KBR?
4       A.   Halliburton, KBR.  They were the prime
5   contractor for the U.S. military in providing all
6   services during most of the time that the U.S. was in
7   Iraq.  So that would have been the summer of 2003 was
8   when we began building facilities.  And we were in Iraq
9   from then until after the U.S. military left.  "We"
10  being my brother and I.
11      Q.   And what did AMD own in Iraq?
12      A.   That's a long list.
13      Q.   Well, give it to me in categories.
14      A.   Okay.
15      Q.   Let's leave the bottling part out.  What
16  besides bottling did you own in Iraq?
17      A.   Well, as an aggregate, by the end of the
18  day the bottling was probably 90 percent of AMD's
19  assets.  But leaving that out, we owned housing.  By
20  that I'm talking about mobile trailers that we would
21  house our staff in.  We owned vehicles.  We owned
22  construction equipment.  We owned tools.  Other than
23  the bottling equipment, I think that's most of the
24  list.  Obviously a lot of personal items.
25      Q.   Were the other things disposed of before

1    the bottling company was?
2        A.    Assets have a life, and as those assets
3    wore out, they were disposed of.  Any assets that
4    weren't worn out were sold to Bright Pearl in 2011.
5        Q.    And what was the sales price to Bright
6    Pearl?
7        A.    They offered to pay us, as I recall, $16
8    million.  They eventually only paid us ten.
9        Q.    Why is that?
10       A.    Why is that?  They chose not to pay us the
11   other $6 million, and the only recourse I had was to
12   sue them in an Iraqi court where the judges were for
13   sale and happened to be related to the people I was
14   going to have to sue.  And that was a losing
15   proposition, so I chose to forfeit that $6 million.
16       Q.    And when Bright Pearl was sold, you
17   retained 10 percent?
18       A.    That's correct.
19       Q.    Do you still have that?
20       A.    I don't.
21       Q.    What happened to it?
22       A.    I sold that to them, and they paid me for
23   it, about -- I want to say almost two years ago.
24       Q.    And how much did they pay for that?
25       A.    $700,000.

1    Q.    So what became of the $10.7 million that
2 you got for Bright Pearl?
3    A.    $10.7 million?  Is that the number?  I was
4 thinking it was $10 million.
5          Oh, you are adding the seven for Bright
6 Pearl.  So those are two different transactions.
7    Q.    I understand that.  But what became of the
8 money?
9    A.    $10 million I took three of that in
10 January of 2012, seven that went to Phil Morrell.  Phil
11 Morrell sold me the remaining business entities.  He
12 sold me the remaining receivables and he took $7
13 million and I took $3 million.  I then reinvested or
14 re-spent almost $6 million cleaning up AMD.  We have
15 talked about what that cleanup was about.
16   Q.    So what did you sell to Phil Morrell for
17 the $7 million?
18   A.    I sold him -- literally it was a stock
19 transfer.  I bought his 50 percent ownership in AMD and
20 his 50 percent ownership in Oasis.  There were no
21 assets in AMD at the time except a receivable for $6
22 million that he left to me to collect.
23   Q.    And what is Oasis?
24   A.    Okay, I'm going to give you a three-minute
25 answer to that one.  Originally, I think in 2005 when

1   hide any of this activity from anybody external.  And
2   Iraq is actually a very, very small business community.
3   Everybody knows everything about everybody.  So my
4   staff, I'm sure, communicated those changes to the
5   vendors.  Let me rephrase that.  I am confident my
6   staff communicated those changes to the vendors.
7        Q.    Even though you didn't tell them to?
8        A.    Even though I didn't tell them to.
9   Because I didn't tell them not to, I'm sure they
10  communicated it.
11       Q.    And can you tell me any communication to
12  any vendor to the effect that this business has been
13  sold and AMD is no longer responsible?
14       A.    No.
15       Q.    Tell me about the closing of the sale of
16  Bright Pearl to the Iraqis.
17       A.    Okay.  What would you like to know?
18       Q.    When did it take place?
19       A.    The signatures were exchanged, as I
20  recall, in Baghdad on January 6th, effective December
21  31st.  And I may be off one or two days, but it's in
22  that window.
23       Q.    Was everybody in the same room or was this
24  done by e-mail or what?
25            MR. HANSEN:  Objection.  Vague as to

1   Freight had notice of the Sale Agreement in 2011 and/or
2   2012."
3       A.   Okay.
4       Q.   And the response says that you object to
5   the response, but subject to that objection you are
6   producing AMD 0178 to AMD 0182.
7       A.   Okay.
8       Q.   And did you participate in that response?
9       A.   Yes.
10      Q.   And it's accurate?
11      A.   Yes.
12      Q.   I'm now going to ask you to look at
13  Exhibit 5.
14           (EXHIBIT 5 WAS MARKED.)
15      Q.   And Exhibit 5 appears to be a series of
16  e-mails all dated November 12, 2012.  Do you
17  acknowledge that?
18      A.   Yes.
19      Q.   My question is this:  As you sit here
20  today, you are not aware of any earlier documents
21  reflecting that Global Freight had notice of the sale
22  agreement that is reflected in Exhibit 3?
23      A.   That's correct.
24           (EXHIBIT 6 WAS MARKED.)
25      Q.   Do you have Exhibit 6 before you, sir?

```
 1        A.     That's correct.
 2        Q.     And who was Martha Petersen?
 3        A.     Marty Petersen.
 4        Q.     Marty Petersen?
 5        A.     Martin Petersen, as in male, was my CFO at
 6   the time.
 7        Q.     And Al-Morrell Development was an LLC, is
 8   an LLC, or incorporation?
 9        A.     I want to say LLC, but I don't recall for
10   sure.
11        Q.     Okay.  And maybe I can refresh your
12   recollection.
13        A.     I'll bet you can.
14               (EXHIBIT 8 WAS MARKED.)
15        Q.     I have handed you Exhibit 8, which appears
16   to be Articles of Amendment to Articles of Organization
17   of Al-Morrell Development, LLC.
18        A.     Uh-huh (affirmative).
19        Q.     Second page, does that bear your
20   signature?
21        A.     Yes.
22        Q.     And it reflects that you are the sole
23   manager; is that your understanding?
24        A.     Yes.
25        Q.     As of the date of that amendment?
```

1    A.    Yes.
2    Q.    Was there more than one manager prior to
3  the date of that amendment?
4    A.    I don't recall.
5    Q.    Was your brother, Phil, ever a manager?
6    A.    Likely, but I don't recall specifically.
7    Q.    Was the relationship between you and Phil
8  within Al-Morrell co-equal, or was one of you in
9  charge?
10   A.    That's a complicated question.  Have you
11 ever worked with your brother in a business?
12   Q.    No.  I haven't had that burden.
13   A.    Title-wise -- Phil preferred the title
14 "chairman of the board" which, in his mind, put him in
15 charge of everything.  But Phil is a very, very
16 hands-off manager.  Which means the day-to-day
17 decisions were executed by my subordinates.  But their
18 permissions usually came through me.
19   Q.    Okay.  So Phil was in charge of the
20 success and you of the less than.
21   A.    You've got it exactly right.  He gets
22 credit and I get blame.  And it actually works good for
23 both of us.
24   Q.    Which of you is older?
25   A.    I'm older.

| | | |
|---|---|---|
| 1 | | of all cash, coin currency, and accounts receivable? |
| 2 | A. | I don't know that number. |
| 3 | Q. | Do you have any order of magnitude? |
| 4 | A. | Typically we had $4 million, plus or minus, in liquidity. |
| 6 | Q. | What was your capitalist job that you undertook at age 9? |
| 8 | A. | My dad was working at Kennecott and he would bring home interesting rocks, and I would sell them to all the kids in the neighborhood. |
| 11 | Q. | Cool. What did you do with the money? |
| 12 | A. | I'm sure I blew it. That's what I normally do with money. |
| 14 | Q. | Let's go back just for a moment to Exhibit 7. And I think you reflected you probably didn't see this until litigation began? |
| 17 | A. | That's an accurate statement. |
| 18 | Q. | But you don't deny this was an Al-Morrell, an AMD contract? |
| 20 | A. | I don't deny it. |
| 21 | Q. | So of the $10 million that you received at closing, $7 million was given to Phil when? |
| 23 | A. | The 10th of January, plus or minus. |
| 24 | Q. | And $3 million was given to you when? |
| 25 | A. | The same time. |