# Exhibit C

# CONDENSED TRANSCRIPT

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GLOBAL FREIGHT SYSTEMS CO. W.L.L. GAMA CENTER; and GENOA PLASTIC INDUSTRIES,<br><br>    Plaintiffs,<br><br>vs.<br><br>AL-MORRELL DEVELOPMENT, LLC and PAUL A. MORRELL,<br><br>    Defendants. | 30(b)(6) Deposition of Al-Morrell Development, LLC, through:<br><br>Martin F. Petersen<br><br>Case No. 1:14-CV-00133-TC<br><br>Hon. Tena Campbell |

August 17, 2015 * 1:00 p.m.

Location:  Jones Waldo Holbrook & McDonough
170 South Main Street, Suite 1500
Salt Lake City, Utah   84111

Reporter:  Diana Kent, RPR, CRR
Notary Public in and for the State of Utah

236 SOUTH 300 EAST
SALT LAKE CITY, UT 84111

CITICOURT
THE REPORTING GROUP

801-532-3441
FAX: 801-532-3414

WWW.CITICOURT.COM          INFO@CITICOURT.COM

Martin F. Petersen  *  August 17, 2015

Sheet 5

**17**

1  Q. Okay.
2  A. We were based in Kuwait right at the
3  beginning of 2003. And we continued that office -- I'm
4  sure it moved after I left, I know they moved to
5  different places, but we were based out of the Hilton
6  resort while I was there. And so after about a year, I
7  moved to the Salt Lake office or the Holladay office.
8  Q. Okay.
9  A. And so it was there for -- actually, I
10 don't know how long it was there for. But then I left,
11 and sometime after I left they moved to Bluffdale. And
12 so then when I came back, after Africa, I officed in
13 Bluffdale. And then after Bluffdale it moved to 90th
14 South, and that's -- at that point it was shut down
15 after that.
16 Q. And I apologize if you have already
17 explained this, but before Africa were you working for
18 AMD and the Event Source simultaneously?
19 A. Right after AMD was organized, I was
20 effectively the CFO of that business. However, shortly
21 after that it split and I was the Event Source CFO, and
22 then AMD had a separate group running it. And that was
23 a year-ish after.
24 Q. And when you said they had a separate
25 group running it --

**18**

1  A. So Paul Morrell wasn't -- originally Paul
2  Morrell was part of AMD. But in terms of managing AMD,
3  it was mostly Phil. And as time went on, Phil really
4  was the AMD person. And so Phil had his people
5  operating AMD. And so it was kind of a separate
6  business.
7  Q. When did Phil become more involved?
8  A. It was gradual. It would have been
9  probably the 2005 time frame when he really kind of
10 took over just AMD and had his people in it.
11 Q. Okay. So after 2005, who were the people
12 primarily managing AMD?
13 A. Phil. The accounting person was Stewart
14 Petersen. And then Phil had -- I don't recall any
15 other names.
16 Q. Tolly DiCosmo? Was he still --
17 A. No. Tolly didn't come in until sometime
18 after the water bottling business started. What I'm
19 telling you is this is all prior to the water bottling
20 business.
21 Q. Okay.
22 A. It's just when AMD was a construction
23 business and the Event Source was a dining facility
24 business.
25 Q. So when it was a water bottling business,

**19**

1  who were the managers?
2  A. Paul Jeffries was CFO, who then became the
3  CEO. I don't know when that happened. But I was no
4  longer involved so I just know that from talking with
5  Paul or Phil every once in a while.
6  So Paul Jeffries was the CFO who then
7  became the CEO. Dan Petsche was a contracts guy. I'm
8  not sure the full scope of his stuff. Mike Bishop was
9  the supply chain person. Neil Vos became the CFO. I
10 think when Paul Jeffries became CEO, he hired Neil Vos
11 as the CFO.
12 Q. How do you spell "Vos"?
13 A. V-O-S. But again, I wasn't there so I
14 don't know exactly how things --
15 Q. What time frame are we talking about right
16 now?
17 A. This would have been for the period after
18 the contract was secured, the water bottling contract
19 was secured, which I think was in the 2005, 2006 time
20 frame. All of those people were involved, except for
21 Neil Vos wouldn't have been right up front. He would
22 have joined after Paul Jeffries became the CEO.
23 Q. And how long did AMD perform water
24 bottling services in Iraq?
25 A. I think through January 3rd, which is when

**20**

1  Paul sold the business, 2012.
2  Q. But you're saying that you were not around
3  during the time that AMD was doing the water bottling?
4  A. I was not there until June, the end of
5  June of 2011.
6  Q. Okay. How long have you known Paul
7  Morrell?
8  A. I first met him I think in early 2003.
9  Q. And how long have you known Phil Morrell?
10 A. Same time.
11 Q. Do you know Dan Hobson?
12 A. I have met Dan Hobson. He came to
13 Bluffdale once during the period I was there.
14 Q. What was his position at AMD?
15 A. He -- I'm not sure all the scope of it,
16 but I believe he was logistics manager or maybe it was
17 called supply chain manager. I'm not sure.
18 Q. And where did he work when he was with
19 AMD?
20 A. I believe he was in Baghdad, or at Camp
21 Victory, which is in Baghdad.
22 Q. Do you know who hired him?
23 A. I don't.
24 Q. What was the purpose of him coming to
25 Bluffdale?

Martin F. Petersen   *   August 17, 2015

Sheet 10

**Page 37**

1  MR. HANSEN: Objection to the extent it
2  calls for a legal conclusion.
3  Q. What was the effect on AMD of that sale?
4  How was AMD impacted?
5  A. AMD's business, the assets supporting
6  AMD's business were sold to a gentleman who ran a
7  business in Iraq.
8  Q. After January 3, 2012, were Dan Hobson and
9  Corey Larson still employed by AMD?
10  MR. HANSEN: Objection to the extent that
11  calls for a legal conclusion.
12  A. Can I answer anyway?
13  Q. Yes.
14  MR. HANSEN: Yes.
15  A. Corey was. I don't recall when Dan Hobson
16  left the business.
17  Q. Did Corey Larson receive pay checks from
18  AMD?
19  A. Yes.
20  Q. How many employees in 2012 received pay
21  checks from AMD?
22  A. I don't know.
23  Q. Were they informed of the sale -- I'm
24  going to rephrase that. Was Corey Larson informed of
25  the sale of the assets, as far as you're aware?

**Page 38**

1  A. I believe so. But I don't know for sure.
2  Q. How many employees were in Kuwait or Iraq
3  in 2012 under AMD, who were employed by AMD?
4  A. At what point in 2012?
5  Q. January.
6  A. I don't know the number. I can give you a
7  ballpark guess.
8  Is that okay?
9  Q. Sure.
10  A. I'm asking my lawyer.
11  MR. HANSEN: As long as it's characterized
12  as a ballpark guess, that's fine.
13  A. I'm guessing fifty, with a big question
14  mark after it.
15  Q. Were they slowly let go?
16  A. Some were very quickly let go. But I
17  think that the others were slowly let go.
18  Q. Are you aware of any agreement between
19  Bright Pearl and AMD regarding their employees, the
20  employees of AMD?
21  MR. HANSEN: I'm going to object to the
22  scope and I believe it was asked and answered in Paul's
23  deposition.
24  MS. WILDE: Sure.
25  MR. HANSEN: So this is outside of the

**Page 39**

1  realm of what he was to testify on behalf of the
2  corporation on.
3  But you can go ahead and answer.
4  A. What was the question?
5  Q. Do you have any understanding as to an
6  agreement between Bright Pearl and AMD regarding AMD's
7  employees?
8  A. Yes. As I recall, the Iraqi gentleman who
9  bought the business, he bought Bright Pearl because
10  Bright Pearl was an Iraqi entity, and the assets
11  supporting the business of the water bottling
12  operations in Iraq were transferred to Bright Pearl,
13  including employees. Does that answer your question?
14  Q. Yes. I think that's a partial answer. I
15  guess a follow-up question I would have is were the
16  employees of AMD then employed by Bright Pearl in
17  January 2012?
18  MR. HANSEN: I'm going to object to the
19  scope again. He wasn't designated to testify on behalf
20  of the corporation on this topic.
21  Q. Do you have any understanding or personal
22  knowledge of that?
23  A. I'll ask a question of you to clarify.
24  Q. Okay.
25  A. Technically or practically?

**Page 40**

1  Q. Let's say technically. But I want to
2  reask the question so I know we are talking about the
3  same thing.
4  A. Okay. Go ahead and reask.
5  Q. In January 2012, do you have any personal
6  knowledge of the AMD employees then being employed by
7  Bright Pearl?
8  MR. HANSEN: Objection to the scope and to
9  the extent it calls for a legal conclusion.
10  A. Can I answer?
11  Q. Yes.
12  A. From a practical standpoint, yes, because
13  the new management came in and wanted to terminate most
14  of the people and we objected to that, saying these X
15  number of people, and I don't remember names or
16  numbers, but I just remember us fighting back saying,
17  "We don't think it's a wise decision to terminate these
18  people for these reasons." And so they backed off on
19  some of the terminations they were planning to make,
20  but not all of them. In other words, we convinced them
21  on some, but we didn't convince them on all.
22  Q. Okay. Were there any changes implemented
23  that would alert AMD's vendors to the sale or transfer?
24  MR. HANSEN: Objection to scope. It's
25  been asked and answered.