IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| GLOBAL FREIGHT SYSTEMS CO., W.L.L., et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>AL-MORRELL DEVELOPMENT, L.L.C., and PAUL A. MORRELL,<br><br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 1:14-cv-133-TC |

Plaintiff Global Freight Systems Co., W.L.L., seeks recovery of $248,000 from Defendant Paul A. Morrell for warehouse and transportation services Global Freight provided to Mr. Morrell's company and co-defendant Al-Morrell Development, L.L.C. (AMD) in Iraq. Although Global Freight has received a $248,000 judgment in this matter against AMD,[1] the judgment is apparently uncollectible from AMD because AMD, through Mr. Morrell, transferred all of its assets to a third-party who is not party to the service agreement between Global Freight and AMD. So Global Freight filed a motion for partial summary judgment against Mr. Morrell[2]

---

[1] The court, in a September 2015 order, found that AMD had breached its contract with Global Freight by failing to pay Global Freight for services provided under the agreement. (See Sept. 14, 2015 Order & Mem. Decision, Docket No. 50.) Based on that breach, AMD is liable to Global Freight for $248,000.

[2] See Global Freight's Mot. for Partial Summ. J., Docket No. 50.

under Utah's Uniform Fraudulent Transfer Act (UFTA).[3]  Simultaneously, Global Freight filed a motion for leave to amend its complaint to add a new, alternative theory of recovery under the UFTA.[4]

The court grants Global Freight permission to file its proposed amended complaint because leave to amend should be freely given, and, contrary to Mr. Morrell's assertion, Global Freight's relatively short delay in filing the motion to amend was not material and did not prejudice Mr. Morrell.[5]  In addition, the court grants Global Freight's motion for partial summary judgment because Global Freight has established that Mr. Morrell received money through a fraudulent transfer of AMD assets.

## FACTUAL AND PROCEDURAL BACKGROUND[6]

AMD was awarded a contract by the United States government to supply water to the United States military and civilians in Iraq.  Paul Morrell is the principal of AMD.  In July 2011, AMD entered into an agreement with Global Freight, under which Global Freight agreed to

---

[3] Utah Code Ann. §§ 25-6-1 to 25-6-14.

[4] The court held a hearing on both motions on April 27, 2016.  At the conclusion of the hearing the court ruled from the bench and granted the motion for leave to amend.  (See Apr. 27, 2016 Minute Order, Docket No. 75.)  The court took the motion for partial summary judgment under advisement.  (Id.)  Global Freight has since filed its amended complaint and Mr. Morrell has answered.  (See Docket Nos. 76-77.)  But, for clarity, the court includes its analysis of the motion for leave to amend in this order.

[5] Docket No. 49.

[6] Because the court grants Global Freight's request to add an alternative theory under UFTA, the court's analysis includes consideration of that theory as set forth in Global Freight's proposed Amended Complaint (attached as Ex. A to the Motion for Leave to Amend, Docket No. 49-1).  For the same reason, the court recites facts established in the summary judgment briefs.  (Global Freight drafted its motion assuming that the court would grant its request for leave to amend.)

transport the water in Kuwait and Iraq and provide warehouse services for one year.  The one-year Service Provider Agreement, which went into effect in July 2011, governed the business relationship.

After AMD refused to pay Global Freight for services totaling approximately $248,000, Global Freight brought this action against AMD and Mr. Morrell.  In June 2015, Global Freight filed a motion for partial summary judgment against AMD, which this court granted in September 2015.  (See Sept. 14, 2015 Order & Mem. Decision, Docket No. 50.) In that order, the court held that AMD breached the Service Provider Agreement:

> AMD's argument [that the contract obligation, upon transfer of the assets, fell to Bright Pearl] is contrary to the well-settled principle of contract law "that an obligor cannot free itself of contractually created duties by delegating them to another, without the consent of the persons to whom it is obligated."  Old West Annuity & Life Ins. Co. v. Progressive Closing & Escrows, Inc., 74 Fed. Appx.4, *8, 2003 WL 21872555 (10th Cir. 2003) (internal citations omitted).  Global Freight did not consent to Bright Pearl taking over AMD's duty to pay Global Freight.  In fact, it appears that Global Freight was unaware during the life of its agreement with AMD that Bright Pearl existed.  AMD was required by the agreement to pay Global Freight for its services.  AMD breached the agreement when it failed to do so.

(Id. at 3 (emphasis added).)

Judgment in the amount of $248,000 has already been entered against AMD.  Now Global Freight seeks a similar judgment against Paul Morrell for fraudulent transfer of funds under the UFTA.  Its claim focuses on two different but related transfers.

The first transfer, which occurred on January 3, 2012, was a sale of AMD's assets.  On that day, mid-way through the one-year period covered by the Service Provider Agreement, AMD sold substantially all of its assets to an Iraqi entity named Bright Pearl.  (First Decl. of Paul A. Morrell ¶ 9, Docket  No. 24.)  Bright Pearl was a newly organized corporation created by Paul

Morrell to facilitate the transfer of AMD's assets to a group of Iraqis called the Al-Essam United Group, which included Essam Kareem Alasadi.

The second transfer essentially occurred at the same time and involved the transfer of $10 million of the sale proceeds. Mr. Morrell says that the full purchase price was $18 million. According to Mr. Morrell, the purchasers agreed to pay $10 million at the time the sales agreement was executed, with an additional $8 million to be paid upon completion of certain conditions.

Mr. Morrell refers to a document called the Asset Sale Agreement to explain, at least in part, the terms of sale. (See Second Decl. of Paul Morrell ¶ 6, Docket No. 53-1 (referring to Ex. A to Mot. Partial Summ. J., Docket No. 50-1).) But it is not at all clear that the Asset Sale Agreement documents the sale of assets from AMD to Bright Pearl or from Bright Pearl to Al-Essam. It appears to be an agreement between Oasis International Waters (jointly owned by Paul A. Morrell and Phillip Morrell) as the seller and AL-Essam United Group and BPC Offshore SAL as the buyers. The parties do not discuss Oasis or BPC in the briefs. The document is not signed by all of the parties. It does not refer to AMD or Bright Pearl. The only other writing in the record documenting the terms of the sale is an e-mail from Mr. Morrell to Phil Morrell (Paul Morrell's brother and business partner). (See Jan. 3, 2012 e-mail from Paul Morrell to Phil Morrell, attached as Ex. A to Global Freight's Reply in Support of Mot. Partial Summ. J., Docket No. 64-1.)

The purchasers of the assets never paid the remaining $8 million. Mr. Morrell said he would not be able to collect it in the Iraqi courts, so he eventually wrote off that receivable as uncollectible.

Upon receiving the $10 million, AMD transferred $3 million to Paul Morrell and $7 million to Phil Morrell.[7]

According to Mr. Morrell, two to three weeks after the asset transfer occurred, Mr. Essam Kareem Alasadi's assets were frozen by the Iraqi government. At Mr. Essam's request, Mr. Morrell stepped in and loaned approximately $4 million to Bright Pearl to keep the company operating until Mr. Essam could recover his money and operate the company as originally planned. Mr. Morrell paid the $4 million over a six-month period, from January 27, 2012, to June 28, 2012.

During that six-month transition period, Global Freight continued to provide warehouse and transportation services, all of which it believed were performed for AMD. Emails, invoices, and purchase orders had AMD's name on them. Global Freight did not discover the asset transfer until after it performed its last service under the Service Provider Agreement and was trying to collect from AMD.

After Global Freight's out-of-court efforts failed to get AMD to pay for the services, it filed this suit alleging a breach of contract claim against AMD and a claim under the UFTA against Paul Morrell. Global Freight received a $248,000 judgment against AMD. Now, it asks the court to award a parallel judgment in its favor against Paul Morrell .

## ANALYSIS

In its motion for partial summary judgment, Global Freight relies on different theories under the UFTA to recover from Mr. Morrell. Those theories are based on the same facts, some

---

[7]Phil Morrell is not named as a defendant, and it appears that he had little, if any, involvement with the management of AMD.

of which Global Freight learned during Mr. Morrell's relatively late deposition. Global Freight asks for permission to add those facts to its complaint so it can fully develop its UFTA cause of action against Mr. Morrell and the related remedy. At the same time, based on the assumption that its request for leave to amend would be granted, Global Freight filed its motion for partial summary judgment alleging all of the theories.

**Motion to Amend**[8]

In its motion to amend, dated February 1, 2016, Global Freight asks for permission to add an alternative theory of recovery under UFTA based on new information received during Mr. Morrell's August 2015 deposition.

When Global Freight deposed Mr. Morrell, they learned for the first time about the $10 million that the Morrell brothers received in exchange for the transfer of AMD's assets to Bright Pearl. Global Freight asks for permission to add the facts of the $10 million transfer and, based on those facts, add a second theory alleging that AMD's transfer of the sale proceeds to its principals was fraudulent.

Leave to amend should be given freely, and should only be withheld if the movant has shown undue delay, bad faith, or a dilatory motive, when the movant has repeatedly failed to cure deficiencies by amendments previously allowed, when amendment would cause prejudice to the opposing party, or when amendment would be futile. U.S. ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161, 1166 (10th Cir. 2009) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

Global Freight filed its motion to amend on February 1, 2016, approximately five and a

---

[8]This ruling memorializes the court's April 27, 2016 ruling from the bench granting the motion to amend.

half months after Mr. Morrell's deposition. Mr. Morrell argues that leave to amend should not be granted under Federal Rule of Civil Procedure 15(a)(2) because Global Freight has not provided any explanation for the delay in filing the motion between the deposition and the motion to amend. That can be a reason to deny leave to amend.

But Global Freight cites to many cases where courts found that delays longer than five and one-half month delay were not undue. (See Global Freight's Reply in Support of Mot. Leave to Amend Compl. at 3-4, Docket No. 55.) In addition, Mr. Morrell does not argue that he would be prejudiced in any way by the amendment. According to Global Freight, no additional discovery is necessary because its proposed claim is an extension of its initial fraudulent transfer claim under the UFTA. Because leave to amend should be freely given so that claims may be decided on their merits, and because there is no prejudice to Mr. Morrell, the court grants Global Freight permission to file an amended complaint in the form of the proposed complaint attached to the motion.

## Motion for Partial Summary Judgment – Fraudulent Transfer

Federal Rule of Civil Procedure 56 permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).

Global Freight claims that Mr. Morrell is personally liable[9] to Global Freight for

---

[9]Global Freight asserts an alternative basis for recovering from Paul Morrell. According to Global Freight, a claim under the Utah Fraudulent Transfer Act is a tort. And, because of that, Mr. Morrell "is personally liable for his wrongful activity orchestrating AMD's fraudulent

$248,000 of the proceeds Mr. Morrell received as a result of two related fraudulent transfers of AMD's assets: (1) AMD's sale of its assets to Bright Pearl; and (2) AMD's transfer of the $10 million sale proceeds to Mr. Morrell and his brother Phil Morrell.  The court agrees.

**A.      A Fraudulent Transfer Occurred.**

       1.      <u>AMD's transfer of assets to Bright Pearl was fraudulent.</u>

Global Freight contends that the asset transfer was fraudulent under UFTA Section 25-6-5(1)(a).  A transfer is fraudulent under that provision if: (1) the claim arose before or after the transfer was made; and (2) the transferring party (the debtor) had "<u>actual intent</u> to hinder, delay or defraud any creditor of the debtor."  <u>Id.</u> (emphasis added).

The parties do not dispute that the first element has been established.  But the parties disagree about whether Global Freight has established actual intent to hinder, delay, or defraud.

Actual intent may be inferred from the circumstances.  Indicia of actual intent include (but are not limited to) the following circumstances: the transfer was concealed, or, at a minimum, was not disclosed; the transfer was of substantially all of the debtor's assets; and the debtor was insolvent (or became insolvent shortly after the transfer occurred).  Utah Code Ann. § 25-6-5(2).

Here, Global Freight did not know about the transfer.  And AMD did nothing to notify Global Freight of the transfer.  Mr. Morrell responds that no affirmative effort was made to hide the transfer from Global Freight and so even though Global Freight had no knowledge of the transfer, that lack of knowledge is not evidence of AMD's intent to defraud.  In his deposition,

---

transfer to [Bright Pearl]."  (Mot. for Partial Summ. J. at 16, Docket No. 50.)  The court will not address this theory of recovery because the UFTA provides a sufficient basis for finding Mr. Morrell liable to Global Freight.

Mr. Morrell said:

A.   There was nothing secretive about the transaction.
. . .
[T]here were never any instructions to hide any of this activity from anybody external.  And Iraq is actually a very, very small business community.  Everybody knows everything about everybody. . . . I am confident my staff communicated those changes to the vendors.

Q.   Even though you didn't tell them to?

A.   Even though I didn't tell them to.  Because I didn't tell them not to.  I'm sure they communicated it.

Q.   And can you tell me any communication to any vendor to the effect that this business has been sold and AMD is no longer responsible?

A.   No.

(Dep. of Paul Morrell at 26-27, Docket No. 53-2.)  Mr. Morrell also emphasized that "we celebrated the sale [of the assets] internally.  We embraced the new owners, they were on site, e-mails changed. . . ."  (Id. at 26 (emphasis added).)

Despite the "openness" of AMD, there is no evidence that AMD announced the transfer to anyone who was not directly involved with the transaction.  Mr. Morrell suggests that word of mouth put Global Freight on notice.  "Everybody knew everything about everybody" in Iraq's "very, very small business community."  (Id.)  But there is no evidence that word of mouth reached Global Freight.

Even if there was no affirmative act to cover up the transaction, certainly there was no affirmative effort to let Global Freight know about this major transaction.  AMD essentially turned a blind eye to its obligation to inform Global Freight about the transfer of the Service Provider Agreement to Bright Pearl.

The transaction required a transfer of substantially all of AMD's assets to Bright Pearl.  As detailed below, the transaction left AMD insolvent.  And even if the initial asset transfer did

not result in an insolvent AMD, the subsequent (and apparently simultaneous) transfer of $10 million in sales proceeds to Mr. Morrell and his brother (all of which was orchestrated by Mr. Morrell as AMD's principal) did. AMD was unable to pay Global Freight. (As the court held in its September 2015 Order, AMD's obligation to pay Global Freight under the Service Provider Agreement continued even after the asset transfer was complete.)

The combination of the circumstances described above establish actual intent to defraud AMD's creditors, including Global Freight.

Because Global Freight has established both elements of Section 25-6-5(1)(a), the court holds that the asset transfer to Bright Pearl was fraudulent.

2. <u>AMD's $10 million transfer to Paul and Phil Morrell was fraudulent.</u>

Global Freight asserts that AMD's transfer of $10 million to Paul and Phil Morrell, (a transfer that included the $3 million payment to Paul Morrell), was a fraudulent transfer under two different sections of the UFTA: Section 25-6-5(1)(b)(i), and Section 25-6-6(1). Although the court finds that Global Freight has not established a fraudulent transfer under Subsection 5(1)(b)(i), Global Freight prevails under Subsection 6(1). Additionally, the indicia of actual intent to hinder, delay, or defraud creditors such as Global Freight that make the asset transfer fraudulent also make the $10 million transfer fraudulent under Subsection 5(1)(a).

a. *The "Engaged in Business or Transaction" Theory (Subsection 5(1)(b)(i))*

Under this theory, the $10 million transfer was fraudulent if: (1) Global Freight's claim arose before or after the transfer made by the debtor; (2) AMD did not receive a reasonably equivalent value for the transfer; and (3) AMD was engaged or was about to be engaged in a business or transaction for which the remaining assets of the debtor were unreasonably small in

relation to the business or transaction. Utah Code Ann. § 25-6-5(1)(b)(i). Global Freight has not established the third element, i.e., that AMD engaged, or was about to engage, in a business or transaction that was unreasonably large given AMD's remaining assets.

Under the one-year Service Provider Agreement, AMD owed approximately $248,000 to Global Freight (approximately $71,000 was incurred at the time of the transfer and the remainder was incurred after the asset transfer). Under the terms of the agreement, AMD engaged the services of Global Freight on an as-needed basis—that is, the existence of the agreement by itself did not obligate AMD to pay Global Freight any amount of money. So at the time of the transfer, it was not clear that AMD was going to continue using Global Freight's services. Indeed, AMD said that Bright Pearl took over the contract and used Global Freight's services. According to Mr. Morrell, after the January 2012 asset transfer, AMD was no longer in the business of manufacturing bottled water.

No transaction was on the horizon. And the existence of a "pay as you go" contract that was executed six months earlier does not qualify as an ongoing transaction.

  b.  *The Insolvency Theory under Subsection 6(1)*

Under this theory, a transfer is fraudulent if: (1) the creditor's claim arose before the transfer made by the debtor; (2) the debtor did not receive a "reasonably equivalent value in exchange for the transfer or obligation;" and (3) the debtor was insolvent at the time of the transfer, or became insolvent as a result of the transfer. Utah Code Ann. § 25-6-6(1).

The first element is established. Global Freight's claim includes AMD's obligation to pay for services provided before January 3, 2012, when the asset transfer and subsequent transfer of $10 million to Mr. Morrell and his brother occurred.

Global Freight has also presented facts that AMD did not receive a reasonably equivalent value in exchange for its $3 million payment to Paul Morrell and its $7 million payment to Phil Morrell. Neither Paul Morrell nor Phil Morrell gave anything to AMD in exchange for the $10 million. Mr. Morrell attempts to justify his receipt of $3 million by suggesting that the money was to compensate him for his work to arrange the asset transfer and get the company through the six-month transition period. He provides no written agreement for such compensation. And the need for his support during that transition period was unexpected; no one could have predicted that Mr. Essam's money would be seized by the Iraqi government. The agreement to pay him $3 million was part of the initial transaction, all of which was planned before the post-transfer need for Mr. Morrell's services arose. The $3 million could not have been compensation for work that was not anticipated and had not yet been provided to AMD (or Bright Pearl). He offers no other explanation for his receipt of the $3 million.

Finally, Global Freight has established the third element: insolvency. Under the UFTA, "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." Utah Code Ann. § 25-6-3(2).

AMD did not pay its debt to Global Freight. Mr. Morrell contends that AMD transferred its debts ($1.4 million) to Bright Pearl so AMD did not have any debts to pay. But Mr. Morrell cannot rely on that argument because under the law of the case (the court's September 2015 order), any alleged transfer of liability for services provided by Global Freight was not valid. The debts stayed with AMD. And after the $10 million in sale proceeds were transferred to Paul and Phil Morrell, AMD had nothing left to pay Global Freight either for past services or for the services that Global Freight provided after January 3, 2012.

Mr. Morrell contends that the $8 million receivable was more than enough to cover any debts AMD might incur in the future. But even assuming that the $8 million was payable directly to AMD[10] at some time in the future after certain conditions had been met, that possibility did not give AMD the ability to pay its debts as they became due. Accordingly, it was insolvent.

For the reasons set forth above, the court finds that the $10 million transfer was fraudulent under the insolvency theory.

      c.     *Actual Intent to Hinder, Delay or Defraud Creditors  (Subsection 5(1)(a))*

The $10 million transfer occurred at the same time the AMD assets were transferred. That transfer was part of the overall transaction that had been planned and eventually executed on January 3, 2012. Global Freight was not aware of this transfer. The same circumstances that made the asset transfer fraudulent make the $10 million transfer fraudulent.

**B.**    **Global Freight has a remedy for fraudulent transfer from Paul Morrell.**

Now that Global Freight has established that AMD engaged in a fraudulent transfer Global Freight may recover the $248,000 from the $3 million received by Paul Morrell if it establishes one or both of the following: It can recover money from proceeds held by the person for whose benefit the transfer was made. Or it can recover money from proceeds held by a subsequent transferee as long as that person did not receive proceeds in good faith. Utah Code Ann. §§ 25-6-9(2)(a)-(b). Global Freight asserts that Paul Morrell falls into both categories.

---

[10]The absence of a written agreement and the vague and sometimes contradictory evidence of the terms and structure of the transaction make it practically impossible (at least based on the existing record) to determine who owed what obligation to whom and when.

1.    <u>Asset Transfer</u>

Global Freight seeks it remedy for the asset transfer from a "<u>subsequent transferee other</u> <u>than a good faith transferee</u> who took for value or from any subsequent transferee." Utah Code Ann. § 25-6-9(2)(b) (emphasis added). The evidence establishes that Paul Morrell is a subsequent transferee who took the money in bad faith.

First, Mr. Morrell received $3 million that came from proceeds of the sale of AMD's assets. He is a subsequent transferee.

Second, Mr. Morrell's self-dealing establishes that he took the money in bad faith. His acts enabled the transfer to occur. He is the managing partner of AMD. He orchestrated and negotiated the transfer. He set up Bright Pearl. He handled the money related to the asset transfer. He paid himself and his brother the money out of AMD's proceeds. That is, either he wrote himself a check for $3 million out of AMD's accounts (he was the managing director and sole owner at the time, because he bought his brother's interest in AMD) or he received the money directly from the Iraqis as part of a transaction that he negotiated. In addition, neither he nor Phil Morrell gave anything to AMD in exchange for the $10 million.

The asset transfer that he arranged was not disclosed to Global Freight by either AMD or Bright Pearl (Mr. Morrell's company). He made no attempt to satisfy AMD's debts, including the debt to Global Freight, before transferring money to himself. The $10 million transfer left AMD insolvent, even though Mr. Morrell was aware that AMD had obligations to pay Global Freight for services already provided.

All of the above circumstances point to bad faith on Mr. Morrell's part (individually and as the principal of both AMD and Bright Pearl). Accordingly, Global Freight may recover its

money directly from Mr. Morrell.

       2.       <u>$10 Million Transfer</u>

Global Freight asserts a right to recover on its $248,000 claim under Section 25-6-9(2)(a), which allows a creditor to recover from "the first transferee of the assets or the person for whose benefit the transfer was made[.]" <u>Id.</u> Clearly Mr. Morrell was the first transferee – he received $3 million directly from AMD.

Along the same lines, he was the one for whose benefit the transfer was made. He either wrote himself a check through AMD (he is the managing partner) or he negotiated an agreement with the Iraqis where he received the $3 million directly as part of the asset sale agreement. Either way, he took the steps necessary to make sure he received $3 million of what was AMD's money, and money that was in essence already pledged to pay creditors such as Global Freight.

Global Freight may recover its money from Mr. Morrell under this alternative theory.

## ORDER

For the foregoing reasons, Global Freight's Motion for Leave to Amend the Complaint (Docket No. 49) is GRANTED.[11] In addition, Global Freight's Motion for Partial Summary Judgment (Docket No. 50) is GRANTED.

DATED this 29th day of June, 2016.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge

---

[11]As noted earlier, the court granted the motion for leave to amend during the court's April 27, 2016 hearing. This is simply a written version of the court's ruling from the bench.